IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA L. DEZACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1418 |
| | ) | |
| ALLIANCE IMAGING, INC.; TIMOTHY | ) | |
| BURKE, individually and as Senior | ) | |
| Marketing Representative for Alliance | ) | |
| Imaging, Inc.; CHRISTOPHER | ) | |
| GRUTTADAURIA, individually and as | ) | |
| Recruiter and Human Resources Director | ) | |
| for Alliance Imaging, Inc.; RICHARD | ) | |
| JONES, individually and as Vice President | ) | |
| of Operations for Alliance Imaging, Inc.; | ) | |
| and DAN KOBLIN, Vice President of | ) | |
| Human Resources for Alliance Imaging, | ) | |
| Inc. | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge

**OPINION AND
ORDER OF THE COURT**

**<u>Synopsis</u>**

Plaintiff Linda L. Dezack ("Dezack") commenced this action asserting claims for gender

discrimination under Title VII, age discrimination under the ADEA, and Pennsylvania state law

claims for retaliatory/wrongful discharge, intentional infliction of emotional distress and

intentional interference with economic opportunity. Defendants have moved for summary

judgment dismissing the complaint in its entirety. For the reasons set forth below, I dismiss

Plaintiff's Title VII and ADEA claims with prejudice, and dismiss without prejudice Plaintiff's

1

additional claims arising under Pennsylvania law.

## I.  Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion.  Internat'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact.  Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987).  The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that

there is a genuine issue for trial.  Id. at 324.  Summary judgment must therefore be granted

"against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at

322).

## II. Relevant Factual Background

The facts at issue are, for the most part, undisputed.  Indeed, the discrepancies between

Plaintiff's and Defendants' versions of the events involve more the inferences, if any, to be

drawn from those events than the actual facts themselves.

Defendant Alliance Imaging, Inc. ("Alliance") is a nationwide provider of diagnostic

imaging services.  (DSF, at ¶ 6.)[1]  Alliance provides, *inter alia*, MRI, CT, PET, PET CT and

radiation therapy services to hospitals and to radiology and physician groups.  (Docket No. 34-2,

hereinafter referred to as "Burke Dep.," at 10-11.)  Defendant Timothy Burke ("Burke") was at

all relevant times a Senior Marketing Representative for Alliance.  (DSF, at ¶ 2.)  Defendant

Christopher Gruttadauria ("Gruttadauria") was Alliance's Director of Human Resources.

Defendant Richard Jones ("Jones") was Alliance's Vice President of Operations.  Defendant Dan

Koblin ("Koblin") was Alliance's Vice President for Human Resources.  (Id.)

On January 6, 2005, Dezack was extended an offer of full-time employment with

Alliance as an Area Marketing Specialist at a salary of $55,000 per year, plus bonus and car

allowance.  (DSF, at ¶ 11; Docket No. 34-5.)  The position was expressly stated to be at-will and

_____

[1]"DSF" refers to Defendants' Concise Statement of Undisputed Material Facts [Docket
No. 37].  Unless otherwise indicated, Plaintiff has admitted the statement as an undisputed fact.
See Plaintiff's Responsive Concise Statement of Material Facts [Docket No. 46].

Dezack was not offered and did not sign an employment contract.  (Id.)  On January 10, 2005, she accepted the position, and commenced work as of January 17, 2005.  (Docket No. 35-5.)  As a Marketing Specialist[2], Dezack's primary responsibilities were to market Alliance's imaging services to physicians within the Pittsburgh, Pennsylvania market.  (DSF, at ¶ 12.)  Defendant Jones, Alliance's Vice President of Operations for the Northeast division, which includes Pittsburgh, testified that the role of a marketing representative was to "grow the referral base" and "act as a customer liaison."  (Docket No. 34-3, hereinafter referred to as "Jones Dep.," at 22.)  A marketing representative was also required to educate physicians "towards the utilization of PET, since PET was introduced into the practical environment out of the research lab," "provid[e] clinical studies to back up what [she] was stating and how PET should be used or when it should be recommended based on the clinical data," and attend tumor boards[3] at the hospitals.  (Docket No. 44-5, hereinafter referred to as "Dezack Dep.," at 83.)  The parties dispute whether new marketing representatives are considered on probationary status for a period of nine months (Docket No. 44-22, hereinafter referred to as "Dezack Aff.," at ¶ 5) or ninety days (Docket No. 48, at ¶ 2.)  Approximately 75% of Alliance's marketing representatives are women.  (Gruttadauria Dep., at 47.)  Dezack was the oldest marketing representative, at 49 years of age.  (Dezack Aff., at ¶ 15.)

At the time that Dezack began working, she was provided with a copy of Alliance's

---

[2]The terms "marketing specialist," "marketing representative" and "account executive" are used interchangeably by the parties to refer to the same position.  (Docket No. 44-7, hereinafter referred to as "Gruttadauria Dep.," at 11.)

[3] A tumor board is a meeting of physicians in which specific oncology cases are discussed and potential management decisions are made.  (Burke Dep., at 102.)

Employee Handbook.  (DSF, at ¶ 38.)  Section 113 of the Employee Handbook addresses the

employee's right to obtain outside employment.  (Docket No. 34-12.)

> While employed at Alliance, an employee may not work for one of the Company's competitors.  Outside employment that a constitutes a conflict of interest is strictly prohibited.  An employee may not receive any personal income or gain from other companies or individuals outside the Company for materials produced or services rendered while performing his or her job at the Company.
>
> An employee may hold a job with another organization which is not a Company competitor, as long as such job does not interfere with the time requirements of his or her Alliance job and the employee satisfactorily performs his or her job responsibilities with the Company.  All employees will be judged by the same performance standards and will be subject to the Company's scheduling demands, regardless of any outside work requirements.
>
> An employee who wishes to work for another while working for the Company must notify his/her supervisor or manager prior to commencing the other employment. . . .
>
> Failure to notify the supervisor may result in disciplinary action, up to and including termination. . . .

Id.

> Section 114 of the Employee Handbook, entitled "Confidential Information," provided:
>
> The protection of confidential business information and trade secrets is vital to the interest and success of the Company.  You will be required to sign a confidentiality agreement as a condition of employment.  If you disclose trade secrets or confidential business information, you will be subject to corrective action, up to and including termination of employment and legal action, even if you do not actually benefit from the disclosed information.

(Docket No. 34-13.)

> The Employee Handbook also contained a description of Alliance's "Open Door" policy.

(Docket No. 34-14.)  Section 103 of the Employee Handbook provided:

> The Open Door policy at Alliance is designed to provide employees with a process for discussing work-related problems, asking questions or voicing

complaints. Employees are encouraged to discuss work-related issues with their immediate supervisors. The simplest, quickest, and most satisfactory solution will often be reached using this process.

If the discussion with the employee's supervisor does not answer the employee's concerns or resolve the matter to the employee's satisfaction, or if the employee believes it would be inappropriate to contact that person, the employee may discuss the problem with the department executive or the Human Resources Department. If after this discussion the employee is still dissatisfied with the outcome, the employee may present his or her case in writing to the Chief Executive Officer.

If the issue involves the supervisor or manager with whom the employee would ordinarily discuss a problem, or it would be awkward for the employee to discuss the problem with the manager directly, the employee may bypass that individual and talk first to the next level of management.

Difficulties in using the Open Door Policy should be brought to the attention of the Human Resources Department.

(Id.) Dezack acknowledged that she understood that she was responsible for reading and complying with the policies contained in the Employee Handbook. (DSF, at ¶ 38.) Shortly after she started working for Alliance, Dezack contacted the Human Resources department and spoke with Gruttadauria in connection with several benefits questions she had. (Gruttadauria Dep., at 73.)

At some point after commencing employment, Dezack testified that she began to have problems with defendant Burke, a Senior Marketing Representative, and Dezack's immediate supervisor. (DSF, at ¶7; Dezack Aff., at ¶ 6.) She felt that Burke would compare her to other marketing representatives and demean her in calls to upper management. (Dezack Dep., at 60.) While Dezack admits that all of Burke's comments related to business issues, "[i]t was the way he spoke and the tone" that bothered her. (Id. at 75.)

For instance, Dezack stated in her affidavit that "Burke became agitated with my

performance claiming that I should know my job better by this time and that I should participate in the role playing more actively that occurred during the training." (Dezack Aff., at ¶ 7.) In May 2005, Burke accompanied her to visit a "predominate, top-key and referring medical oncologist" with whom she had already established a good rapport. (Id. at ¶8.) According to Dezack, Burke argued with the doctor as to why the doctor was not referring more patients to Alliance, and implied that the doctor was a liar, thereby sabotaging her relationship with the doctor. (Id.) During that same ride-along, she overheard Burke speaking during a conference call with management. When he was asked about why the Pittsburgh territory was performing so well, he replied that "[t]he goals are set too low, physicians were enjoying the attention they were receiving." (Id. at ¶ 9.) He further informed them that Dezack "needed to work on" her clinical discussions. (Id.) Burke then complained to Dezack that she "could not clinically grasp even the two easiest indications of lung cancer and/or lymphoma." (Id. at ¶ 10.) He informed Dezack that in 90 to 120 days, he would visit with her again to discuss her continued employment with Alliance. (Id.)

According to Dezack, Burke also requested that she, as well as the other marketing representatives, engage in activities that she considered a potential violation of HIPAA ("Health Insurance Portability and Accountability Act of 1996"). For instance, Burke requested that all the marketing representatives obtain a "tumor registry" from each of the sites in their territory. (Id. at ¶ 12.)[4] According to Dezack, Burke also insisted that the marketing representatives obtain patient films and personally deliver them to the referring physician, in order to discuss further

---

[4]Dezack explained that a tumor registry is a list identifying by name patients and the type of cancer for which they were being treated at a particular site. (Id.). Burke denies that the tumor registries contain any patient identifying information. (Burke Dep., at 95-96.)

treatment with the physicians. (Id. at ¶ 13.)  Dezack was reprimanded by a hospital radiology manager when she discovered that Dezack had implemented this procedure, but Burke scoffed in response that "it wasn't that bad."  (Id.)  Dezack complained to Burke that these activities constituted HIPAA violations.  (Id. at ¶ 12.)

Similarly, Burke insisted that representatives make every effort to attend tumor boards. When Dezack was refused entry to the tumor boards by hospital staff, Burke urged her to "be creative" and attend the boards in any way she could. (Id. at ¶ 14.)  Dezack admits that she was never formally disciplined for failing to obtain tumor registries or to attend tumor boards.  (Id. at ¶ 59.)  Finally, Burke ordered the marketing representatives to distribute copies of clinical studies published in medical journals to the physicians, in violation of copyright laws, and indicated that he would "take the fall" if anyone of the representatives were caught.  (Id. at ¶14.)

In approximately July 2005, Dezack's friend and colleague, Cary Thompson ("Thompson"), complained about Burke to Gruttadauria.  (Id, at ¶ 23; DSF, at ¶ 2.)  According to Dezack, Thompson reported "incidents of discrimination and/or harassment" to Gruttadauria. (Dezack Aff., at ¶ 23.)  Gruttadauria characterized Thompson's problem as "having some challenges with Mr. Burke's management style," i.e. that Mr. Burke micro-managed his account executives.  (Gruttadauria Dep., at 14-15.)  Gruttadauria conducted an investigation into Thompson's allegations, interviewing two female and one male marketing representatives.  (Id. at 20-21.)  He concluded that, while there was an overall sentiment that Burke micro-managed his employees and had high expectations, there was no evidence of discriminatory treatment. (Id.)  Thompson ultimately was transferred to a new supervisor.  (Dezack Aff., at ¶ 23.)  While Thompson had identified Dezack as another employee who felt similarly with respect to Burke,

Gruttadauria explained that Dezack was not questioned during the investigation of Thompson's complaint because they wanted to focus on more established employees. (Gruttadauria Dep., at 51.)  Dezack also identified, without any supporting detail, two other colleagues, Sheryl Randall and Dawn Preston, as having "suffered similar discriminatory and/or harassing treatment at the hands of Defendant Burke." (Dezack Aff., at ¶ 24.)

On September 28, 2005, Burke received a phone call from Alliance's Pittsburgh-based Area Sales Manager, David Stoner ("Stoner"), who had heard through a colleague that Dezack was providing marketing services to InSight Health Services ("Insight") concurrently with her employment at Alliance.  (DSF, at ¶17; Docket No. 34-10.)  Stoner also apparently called Bill Kelly, Alliance's VP of Sales, who then notified Jones of Dezack's potential employment by InSight. (Jones Dep., at 28.)  InSight, like Alliance, provides diagnostic imaging and imaging guided therapy services in, *inter alia*, the Pittsburgh market.  (DSF, at ¶ 18.)  The parties dispute whether Insight and Alliance are direct competitors.

Jones directed Burke to investigate the truth of the allegation.  (Jones Dep., at 45-46.)  Burke contacted InSight and spoke with an administrator, Doris, who confirmed Dezack's employment by InSight and provided Dezack's telephone number.  (DSF, at ¶20.)  Burke also asked for the contact information for Michael Holmes ("Holmes"), whom he knew to be Insight's Vice President for that region.  (Burke Dep., at 113.)  Because Alliance competed with Insight throughout the Northeast region, and because Dezack had access to Alliance's confidential records and financial documents, Burke wanted to speak to someone higher up at InSight.  (Id. at 114.)  Burke relayed this information to Jones.  (Id. at 21.)

Burke then contacted Holmes of InSight, and informed Holmes that he "thought we may

9

have had a potential conflict of interest regarding" Dezack. (Id. at 116.) Holmes confirmed that

Dezack had been employed full-time by Insight as an outside sales representative for

approximately 30 days. (Id. at 117.) Holmes also stated that he was unaware that Dezack was

still employed by Alliance. (Id.) Burke passed the details of this conversation onto Alliance's

Human Resource department and to Jones. Holmes later called Burke and informed him that

Holmes would be meeting with Dezack later that evening, and "would probably move forward

with terminating her." (Docket No. 34-10.)

Burke had no further contact with InSight regarding this matter. (Burke Dep., at 127.)

The issue of Dezack's dual employment was handled by Gruttadauria, defendant Koblin, and

Alliance's general counsel, Russ Phillips ("Phillips"). (Gruttadauria Dep., at 93.) Koblin spoke

with Bill Brewer ("Brewer"), InSight's Vice President, Human Resources, to further confirm the

details. Brewer confirmed Dezack's address and social security, and informed Koblin that

InSight had hired Dezack on June 27, 2005. (Docket No. 34-11.)

A meeting was held between Jones, Gruttadauria and Phillips, and the decision was made

to terminate Dezack's employment with Alliance. (DSF, at ¶ 31.) Jones explained the basis of

this decision:

> Basis of the decision to terminate Linda was that she had violated a number of
> policies regarding outside employment. And she was working full time for an
> organization at the same time she was supposed to be working full time for
> Alliance. I mean, she had access to confidential business information that I
> believe put the organization in a position of exposure. Clearly, she did not engage
> in asking for permission to work for this other organization.

(Docket No. 34-3, Jones Dep., at 49.)

On the morning of September 29, 2005, Jones contacted Dezack by telephone, with

Gruttadauria listening, and advised Dezack that he had verified her dual employment with InSight, and that her employment with Alliance was terminated effective immediately due to her dual employment and violations of sections 113 and 114 of Alliance's policies regarding outside employment and confidential information. (Jones Dep., at 49-51.) Dezack did not deny her dual employment or offer any explanation to Jones. (Dezack Dep., at 32.)

Indeed, there is no dispute that Dezack was employed full-time by InSight beginning in June 2005 at a salary of $58,000 per year. (Id. at 9, 14, 19.) During that period, she testified that she spent approximately half of her time doing work for Alliance and half of her time doing work for InSight. (Id. at 24.) Dezack explained that she chose not to resign from Alliance when she accepted a job with InSight because she was in a probationary period with both companies and "I took that probationary period to decide which company I should resign from and continue with." (Id. at 31.)

After her termination, Dezack claims that Burke failed to reimburse her for certain expenses she had incurred during the course of her employment. (Dezack Aff., at ¶ 19.) She was eventually reimbursed by Alliance after she filed a formal complaint with a magistrate. (Gruttadauria Dep., at 76-77.)

Alliance also had issues with Dezack after her termination. According to Gruttadauria, Dezack failed to return her laptop computer and other files, which contained confidential Alliance information, to Alliance, despite repeated requests. (Id. at 75.) Dezack eventually returned the computer, by overnight mail. (Id. at 76.)

Dezack has identified three other marketing representatives whom she alleges also held second jobs while they were employed by Alliance, and who were not terminated: Thompson,

who worked in a picture frame shop; Dave Stoner; and Mike Culley. (Dezack Dep., at 35.) Dezack, despite her continued friendship with Thompson, did not know whether Thompson's second employment was full or part-time, whether her hours overlapped with her full-time position at Alliance, or whether she had received permission from Alliance to work at the frame shop. (Id. at 36-37, 43.) Dezack did not know any details regarding Stoner or Culley's alleged second jobs. (Id. at 40-41.)[5]

Dezack never complained to Burke, Burke's supervisor or Human Resources, either during her employment or when she was terminated, that she felt that she was being discriminated against. (Id. at 50.) According to Dezack, all of her co-workers were in their 30s, the oldest being 39. (Id. at 96; Dezack Aff., at ¶15.)

## III. Legal Analysis

### A. Title VII Gender Discrimination

The Supreme Court has established a three-step process courts must follow when evaluating claims of discrimination under Title VII. See McDonnell Douglas v. Green, 411 U.S. 792, 802 (1987). First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff can establish a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment. Once the defendant satisfies its burden, the burden sifts back to the plaintiff to show, by a preponderance

---

[5]Plaintiff argues that "Defendants have not contradicted Plaintiff's assertion with any information that, Plaintiff notes, would be uniquely within their control." (Pl. Opp. Br., at 4.) The Court notes, however, that Plaintiff bears the burden of proof on this issue, and that information related to the comparators' secondary employment, if it exists, could have been obtained through routine discovery. This is certainly true with respect to Thompson, who remains in contact with Dezack.

of the evidence, that the articulated reason is a pretext for a discriminatory motive.  Brown v. Hamot Med. Ctr., 2008 WL 55999, at *7 (W.D. Pa. Jan. 3, 2008) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)).  Defendants argue that Dezack has failed to establish even a prima facie case of gender discrimination, and even if she had, they have a legitimate, non-discriminatory reason for her termination.

### 1.  Prima Facie Case

"To establish a prima facie case of gender discrimination under Title VII of the Civil Rights Act of 1964, the plaintiff must show that she: (1) was a member of the protected class; (2) was qualified for the job; and (3) suffered an adverse employment decision under circumstances that give rise to an inference of unlawful discrimination."  Wooler v. Citizens Bank, 2008 WL 877168, at *2 (3d Cir. Apr. 2, 2008).  That similarly situated nonmembers of the protected class were treated differently than the plaintiff may give rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802.  The plaintiff's evidentiary burden at this stage is "not intended to be onerous."  Opsatnik v. Norfolk Southern Corp., 2008 WL 763745, at *4 (W.D. Pa. Mar. 20, 2008) (quoting Marzano v. Computer Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

Dezack has failed to meet her burden of establishing a prima facie case of gender discrimination.  While she is undoubtedly a member of a protected class, and she unquestionably suffered an adverse employment action, in the form of her termination from Alliance, Dezack has failed at the summary judgment stage to set forth any evidence giving rise to an inference of discrimination.  She identifies three other marketing representatives that purportedly held second jobs while employed by Alliance, but presents no evidence with respect to the nature of their secondary employment or whether they had received permission from Alliance for the

employment. One of those individuals, Thompson, purportedly is a friend of Plaintiff, has visited with Plaintiff during the course of this lawsuit, and yet Plaintiff fails to offer an affidavit from Thompson, or even provide any meaningful details of her secondary employment. Given this lack of detail, the proposed comparators lack probative value.

Dezack also relies on what she characterizes as a "overall pattern of conduct" to establish an inference of discriminatory intent: Burke's purported tone in discussing her job performance; his criticisms of her job performance to other managers; his demands that she attend tumor boards and obtain tumor registries, in violation of patient confidentiality; and his and other managers' investigation into her dual employment. (Pl. Opp. Br. at 6.) Yet these isolated incidents do not, either individually or collectively, give rise to an inference of discrimination. Indeed, the evidence submitted on summary judgment demonstrates that Burke had a difficult management style and made the same demands on *all* his marketing representatives. (See, e.g., Gruttadauria Dep., at 20-21.) The alleged complaints made by other marketing representatives merely bolster the conclusion that Burke's criticisms of her were typical of his management style. Plaintiff did not point to any criticism overtly related to her gender.

As the Third Circuit has explained, albeit in the context of constructive discharge, "evidence of close supervision of job performance must be critically examined so that the ADEA is not improperly used as a means of thwarting an employer's nondiscriminatory efforts to insist on high standards." Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993). I believe this analysis is equally valid herein with respect to Plaintiff's Title VII claim. Moreover, at no time during her employment with Alliance did Plaintiff complain to Burke or any other manager that she felt subject to discrimination. She did not ask for a transfer to a new manager,

as her friend and colleague Thompson successfully had done. Indeed, even after Dezack obtained another full-time job, at an higher salary, she continued to remain in Alliance's employ. I find these circumstances do not set forth a prima facie case of gender discrimination.

### 2. Legitimate Business Reason

Although Dezack has not met her burden of establishing a prima facie case of gender discrimination, I will consider for purposes of this motion whether she has met her burden under the remaining McDonnell Douglas prongs.

Once a plaintiff has set forth a prima facie case of gender discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action against the plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "In order to satisfy its burden of production, a defendant need only introduce evidence that, if taken to be true, would permit the conclusion that the reason for the adverse employment action was nondiscriminatory." Brown v. Hamot Med. Ctr., 2008 WL 55999, at * (W.D. Pa. Jan. 3, 2008) (citing Fuentes, 32 F.3d at 763). Defendants herein have argued that Dezack was terminated for violating sections 113 and 114 of Alliances' Employee Handbook, by holding a second job without permission, working for a competitor, and potentially disclosing confidential business information.

It is undisputed that Alliance expressly prohibits outside employment without notice to and the permission of Alliance. Alliance also expressly prohibits outside employment with one of its competitors. Alliance's Employee Handbook, which Dezack has acknowledged receiving and the responsibility for knowing its contents, expressly states that termination may occur for either of these violations. Accordingly, I find that Defendants have articulated a legitimate, non-

15

discriminatory reason for terminating Plaintiff.

### 3. Pretext

"To withstand summary judgment, a Title VII gender discrimination plaintiff must point to direct or circumstantial evidence sufficient to permit a factfinder either (1) to disbelieve the employer's articulated legitimate reasons for taking an adverse employment action, or (2) to believe that gender discrimination was more likely than not a motivating or determinative cause of the employer's action." Fletcher v. Lucent Tech. Inc., 207 Fed.Appx. 135, 137 (3d Cir. 2006) (quoting Fuentes, 32 F.3d at 764). In other words, the plaintiff "must show such weaknesses, implausibilities, inconsistencies. . .or contradictions in [the defendant's] proffered legitimate reason [such] that a reasonable factfinder could rationally find them unworthy of credence." Brown, 2008 WL 55999, at *10 (alterations in original). The Third Circuit has further explained:

> [F]ederal courts are not arbitral boards ruling on the strength of the 'cause' for the adverse employment action. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination. Therefore, the plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.

Kemp v. Del Monte Foods, 2007 WL 2254678, at *6 (W.D. Pa. Aug. 6, 2007) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1009 (3d Cir. 1996).

In part 1 above, I held that Plaintiff had not met her burden of establishing a prima facie case of gender discrimination. For those same reasons, I find that the evidence submitted by Plaintiff, such as it is, does not raise a genuine issue of material fact as to whether Defendants' reason for terminating her was mere pretext.[6]

---

[6]Plaintiff cites to a decision of the Unemployment Compensation Board of Review, purportedly finding that Alliance had "failed to prove through competent evidence that Plaintiff

In further support of her pretext argument, Plaintiff raises three new arguments which she claims create a genuine issue of material fact precluding summary judgment: (1) whether InSight is in fact a direct competitor of Alliance; (2) "whether obtaining written permission would have been futile and an otherwise mere technical requirement"; and (3) "whether Plaintiff was forced to obtain outside employment in a quasi-constructive discharge fashion." (Pl. Opp. Br. at 9.) None of these arguments has merit.

Plaintiff has testified that Alliance and InSight do not overlap in terms of the physicians and hospitals they serve in the Pittsburgh area. (Dezack Dep., at 21-23.) Defendants have submitted contradictory testimony that one aspect of Plaintiff's job was to expand Alliance's physician and hospital base to include entities currently being served by InSight. (Gruttadauria Dep., at 11; Jones Dep., at 22.) In any event, whether or not they were direct competitors does not undermine Defendants' proffered reason, because it is undisputed that Plaintiff was not permitted to hold *any* secondary employment without notice to and permission from Alliance, and that failure to comply with this policy could result in termination. It is further undisputed that Plaintiff never sought or otherwise obtained such permission.[7] Finally, it is undisputed that

was simultaneously working for a competitor company" and which affirmed the Referee's Order holding that "Plaintiff had performed her duties to the best of her ability and did not knowingly violate any employer rules or policies." (Pl. Opp. Br. at 11 n.2.) That decision is not binding on this Court. Further, a reading of the decision, which was not submitted by Plaintiff, demonstrates that Alliance failed to appear or offer testimony at the hearing; thus the decision was based only on the evidence submitted by Plaintiff. While there does appear to have been a remand hearing during which Alliance presented some undisclosed evidence, this occurrence, without more, provides me with no basis to find the UCBR's decision relevant, let alone persuasive, for purposes of this motion.

[7]Plaintiff has submitted no evidence in support of her argument that a request for permission would have been futile - that is, beyond the obvious unlikelihood of Alliance actually agreeing that Plaintiff could accept a second full-time job with InSight.

Plaintiff was terminated when Defendants discovered that Plaintiff, despite being paid for a full-time job with Alliance, had been simultaneously working full-time for Insight for over three months. Given these facts, I do not believe there is any factfinder in this jurisdiction which would disbelieve Defendant's proffered reason for terminating Plaintiff.

Plaintiff's constructive discharge argument[8] is, if possible, even more baseless. "In order to establish a constructive discharge claim, a plaintiff must produce evidence sufficient to show that discriminatory conditions of employment were so intolerable that a reasonable person subject to them would have felt compelled to resign." Trimble v. Fleetwood Homes of PA, 49 Fed.Appx. 385, 386 (3d Cir. 2002). Plaintiff argues that constructive discharge is applicable herein because Burke threatened her employment and provided an unsatisfactory job performance review to upper management. (Pl. Opp. Br. at 10.) Once again, the "evidence" submitted herein does not support Plaintiff's position.

"While the law protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline." Tunis v. City of Newark, 184 Fed.Appx. 140, 143 (3d Cir. 2006). Moreover, "[t]he law of constructive discharge is not concerned with subjective fears of possible future dismissal." Id. Burke's generalized statements regarding future performance evaluations, and his negative assessments of Plaintiff's performance simply do not rise to level of constructive discharge. See,

_____

[8]Plaintiff did not plead a claim for constructive discharge, nor did she exhaust her administrative remedies for such a claim. Accordingly, to the extent Plaintiff's argument attempts to assert an actual claim for constructive discharge, it is barred. See Johnson v. Gober, 83 Fed.Appx. 455, 460 (3d Cir. 2003).

e.g., Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir.), cert. denied, 510 U.S. 964 (1993). Most significantly, her actions belie her words. It is completely disingenuous of Plaintiff to argue constructive discharge when she obtained another full-time job, at a higher salary, yet still did not resign from Alliance for three months, and spent the three months prior to her termination from Alliance collecting paychecks from both employers and ostensibly deciding which of two full-time jobs she preferred.

### 5. Hostile Work Environment[9]

A plaintiff can establish a claim for hostile work environment by showing: "(1) the employee suffered intentional discrimination because of sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) there is a basis for respondeat superior liability." Trimble, 49 Fed.Appx. at 386. "Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial." Nolan v. Swartz Campbell, LLC, 2008 WL 598291, at *7 (W.D. Pa. Feb. 29, 2008).

"Conduct becomes actionable only where it has become sufficiently extreme to amount to a change in the terms and conditions of employment." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). "All of the circumstances surrounding the asserted hostile conduct are to be examined in determining whether a work environment is sufficiently severe or pervasive." Id. "The court should assess the objective severity of the harassment and can

_____

[9]This claim was also not expressly pleaded by Plaintiff.

consider (1) its frequency, (2) its severity, (3) whether it is physically threatening or humiliating (as opposed to an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance and (5) the effect on the employee's psychological well-being." Id.

Plaintiff was employed by Alliance for approximately nine months, from January through September 2005. In support of her hostile work environment argument, Plaintiff recites only one specific occasion of purportedly poor treatment from Burke - during a ride-along in May 2005, when she overheard him giving her a negative evaluation to upper management, when he directly complained to her about her performance, and when he spoke harshly to one of her physician contacts. Apart from this specific instance, the evidence submitted by Plaintiff, outlined above, is too non-specific to have probative value. Accordingly, I find that Plaintiff has failed to raise an question of fact as to whether she was subjected to a hostile work environment.

*          *          *

Accordingly, I grant summary judgment dismissing Plaintiff's first claim for gender discrimination under Title VII.

### B. Age Discrimination

Under the ADEA, a plaintiff may establish a prima facie case of age discrimination by demonstrating: (1) she is over forty; (2) she is qualified for the position in question; (3) she suffered an adverse employment decision; and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. Hill v. Borough of Kutztown, 455 F.3d 225, 247 (3d Cir. 2006) (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)). Like the Title VII analysis set forth above, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for

its actions.  <u>Wooler v. Citizens Bank</u>, 2008 WL 877168, at * 2 (3d Cir. Apr. 2, 2008).  If the employer meets this burden, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's articulated reasons were a pretext for discrimination.  <u>Id.</u>

      To support her age discrimination claim, Dezack relies on the same evidence and argument submitted in support of her gender discrimination claim.  (Pl. Opp. Br. at 14.)  The only additional facts she sets forth in support of her age discrimination claim are: (1) her own age, 49, and her uncorroborated belief that her colleagues were all in their 30s; and (2) her interpretation of Thompson's complaint to Human Resources as evidence of Alliance's "pattern or practice of hiring young, attractive marketing representatives to solicit their equipment."  (Pl. Opp. Br. at 14-15.)  The latter, certainly, is belied by Alliance's hiring of Plaintiff despite her age.

For the same reasons that I dismissed Plaintiff's gender discrimination claim, I also dismiss her age discrimination claim.  Plaintiff has not set forth a prima facie case of age discrimination, since she has adduced no evidence that younger persons were treated differently than she was, or that raises an inference of age discrimination.  Even if Plaintiff had set forth a prima facie case, the evidence submitted by Plaintiff does not raise a question of fact as to whether Alliance's reason for terminating her employment was a pretext for discrimination.  In addition, the ADEA does not provide for individual liability.  <u>See</u> <u>Hill</u>, 455 F.3d at 246 n.29 (3d Cir. 2006).  Accordingly, I dismiss Count II of the Complaint as against both Alliance and the individual Defendants.

### C. State Law Claims

Counts III through V of the Complaint set forth claims under Pennsylvania state law for, respectively, retaliatory discharge/wrongful discharge, intentional infliction of emotional distress, and intentional interference with economical (sic) opportunity. "[A]bsent extraordinary circumstances, where the federal causes of action are dismissed the district court should. . .refrain from exercising [supplemental] jurisdiction." Bright v. Westmoreland County, 380 F.3d 729, 751 (3d Cir. 2004). Plaintiff and Defendants have not alleged any such extraordinary circumstances, nor are any apparent to me. Accordingly, I dismiss Counts III through V without prejudice to refiling in state court.

## CONCLUSION

The Defendants' motion for summary judgment is granted. Counts I and II are hereby dismissed with prejudice and Counts III through V are hereby dismissed without prejudice to refiling in state court.

## ORDER OF THE COURT

AND NOW, this 3rd day of June, 2008, after careful consideration, and for the reasons set forth in the accompanying Opinion, Defendants' motion for summary judgment [Docket No. 35] is granted. Counts I and II of the Complaint are dismissed with prejudice, and Counts III through V of the Complaint are dismissed without prejudice to refiling in state court.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge